

**RECEIVED**

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

AUG 1 1 2008
Aug 11, 2008
MICHAEL W. Dobbins
CLERK, U.S. DISTRICT COURT

Alann Vega #R04203

_____

_____

_____

(Enter above the full name
of the plaintiff or plaintiffs in
this action)

vs.

Terry McCann,
Roger E.Walker Jr.,
Othello L.Hamilton,

Darryl Johnson,
Anna Dockery,

Lieutenant Edwards,
Ami Workman,

Lieutenant Buzinaci,
Lieutenant Vaughn,
Sherry T.Benton,IDOC,individually
and in his/her officiel capacity.

(Enter above the full name of ALL
defendants in this action. <u>Do not</u>
use "et al.")

08cv4536
JUDGE COAR
MAGISTRATE JUDGE COX

**CHECK ONE ONLY:**

__X__    COMPLAINT UNDER THE CIVIL RIGHTS ACT, TITLE 42 SECTION 1983
         U.S. Code (state, county, or municipal defendants)

_____    COMPLAINT UNDER THE CONSTITUTION ("BIVENS" ACTION), TITLE
           28 SECTION 1331 U.S. Code (federal defendants)

_____    OTHER (cite statute, if known)

*BEFORE FILLING OUT THIS COMPLAINT, PLEASE REFER TO "INSTRUCTIONS FOR
FILING." FOLLOW THESE INSTRUCTIONS CAREFULLY.*

**I.    Plaintiff(s):**

A.    Name: __Alann Vega__

B.    List all aliases: __None__

C.    Prisoner identification number: __R04203__

D.    Place of present confinement: __Stateville Correctional Center__

E.    Address: __P.O Box 112,Joliet,Il 60434__

(If there is more than one plaintiff, then each plaintiff must list his or her name, aliases, I.D. number, place of confinement, and current address according to the above format on a separate sheet of paper.)

**II.    Defendant(s):**
(In A below, place the full name of the first defendant in the first blank, his or her official position in the second blank, and his or her place of employment in the third blank. Space for two additional defendants is provided in **B** and **C**.)

A.    Defendant: __Terry McCann__

Title: __Warden__

Place of Employment: __Stateville C.C__

B.    Defendant: __Roger E Walker Jr.__

Title: __Director IDOC__

Place of Employment: __1301 Concordia Court/P.O Box19277 Sprinfield,IL 62794.__

C.    Defendant: __Othello L.Hamilton__

Title: __Correctional officer__

Place of Employment: __Stateville C.C__

(If you have more than three defendants, then all additional defendants must be listed according to the above format on a separate sheet of paper.)

Revised 9/2007

D.   Defendant:Darryl Johnson

    Title:Hearing Committee Chair person

    Place of Employment:Stateville C.C

E.   Defendant:Anna Dockery

    Title:Hearing Committee person

    Place of Employment:Stateville C.C

F.   Defendant:Lieutenant Edwards

    Title:Lieutenant

    Place of Employment:Stateville C.C

G.   Defendant:Ami Workman

    Title:Grievance Officer

    Place of Employment:Stateville C.C

H.   Defendant:Sherry T.Benton

    Title:Administrative Review Board Person

    Place of Employment:1301 Concordia Court/PO Box 19277
                            Springfield,IL 62794

I.   Defendant:Lieutenant Buzinsci

    Title:Lieutenant

    Place of Employment:Stateville C.C

J.   Defendant:Lieutenant Vaughn

    Title:Lieutenant

    Place of Employment:Stateville C.C

K.   Each defendant is sued individually and in his/her official
    capacity.At all times mentioned in this complaint each defendant
    acted under the color of state law.

III.    Exhaustion of Administrative Remedies

You are required to exhaust all your available administrative remedies before bringing an action in federal court.

A.    Is there a grievance procedure available at your institution?

YES (X)  NO ( )  If there is no grievance procedure, skip to F.

B.    Have you filed a grievance concerning the facts in this complaint?

YES (X)  NO ( )

C.    If your answer is YES:

1.    What steps did you take?
Grievance was filed on 5/03/07 and sent to counselor.

Counselor fowarded grievance directly to the Grievance

Officer for responce.

2.    What was the result?
Grievance Officer denied grievance on May 10,2007

subsequent recommendation was approved by the Chief--
Administrative Officer on May 17,2007.

3.    If the grievance was not resolved to your satisfaction, did you appeal?

What was the result (if there was no procedure for appeal, so state.)

Grievance was appealed to the Administrative Review Board
and was denied relief.

D.    If your answer is NO, explain why not:
N/A

4

IV.   **List ALL lawsuits you (and your co-plaintiffs, if any) have filed in any state or federal court in the United States:**

A.   Name of case and docket number: _____**N/A**_____

_____

B.   Approximate date of filing lawsuit: _____**N/A**_____

C.   List all plaintiffs (if you had co-plaintiffs), including any aliases: ___**N/A**_____

_____

_____

_____

D.   List all defendants: _____**N/A**_____

_____

_____

_____

E.   Court in which the lawsuit was filed (if federal court, name the district; if state court, name the county): _____**N/A**_____

F.   Name of judge to whom case was assigned: _____**N/A**_____

_____

G.   Basic claim made:_____**N/A**_____

_____

_____

H.   Disposition of this case (for example: Was the case dismissed? Was it appealed? Is it still pending?): _____**N/A**_____

_____

_____

I.   Approximate date of disposition: _____**N/A**_____

**IF YOU HAVE FILED MORE THAN ONE LAWSUIT, THEN YOU MUST DESCRIBE THE ADDITIONAL LAWSUITS ON ANOTHER PIECE OF PAPER, USING THIS SAME FORMAT. REGARDLESS OF HOW MANY CASES YOU HAVE PREVIOUSLY FILED, YOU WILL NOT BE EXCUSED FROM FILLING OUT THIS SECTION COMPLETELY, AND FAILURE TO DO SO MAY RESULT IN DISMISSAL OF YOUR CASE. CO-PLAINTIFFS MUST ALSO LIST ALL CASES THEY HAVE FILED.**

Revised 9/2007

## V. Statement of Claim:

1) On March 28,2007 Officer Othello L.Hamilton conducted a urinalysis drug test on plaintiff Alann Vega using a "Quick - Screen 5 Drug Test Cup" inside a filthy storage utility cell room in Edwards Housing Unit at Stateville C.C.

2) Plaintiff complied by providing a urine sample in which officer Othello L.Hamilton read the results from the test cup **immediately afterward.**

3) Officer Othelo L.Hamilton stated to plaintiff **"Your pop'ed!"** meaning plaintiff tested positive for a control substance.(See-**Exhibit 1**)

4) Plaintiff  tried to object to the positive results and asked for a second test to prove the first reading was a false positive. However officer Othello L.Hamilton responded **"I aint trying to hear that shit,your pop'ed!"**

5) Plaintiff was escorted to segregation and was confined immedia-ately.On April 10,2007 plaintiff was schedule to appear infront of the Adjustment Committee for disciplinary report written by officer Othello L.Hamilton.PLaintiff entered a not guilty plea and tried to explain the results that was given by the **"Quick Screen 5 Drug Test Cup"** was a false positive and begged for a second drug test to prove it but was ignored by defendants Darryl-Johnson and Anna Dockery.Said defendants and Terry McCann gave plaintiff 6 months segregation,6 months commisary restriction,6 months C grade,6 months Contact visit restriction,a $7.88 restitu-tion fee for a drug testing cup,and 6 months lost of good time credits,which does not pertain to plaintiff for an alleged dirty drug test drop.(See **exhibit 3**)

6) Upon information and belief plaintiff was informed about the shabby quality of the "Quick Screen 5 Drug Test Cup"by medical staff at Stateville's health care center,that officers where conducting drug test  with unreliable and expire drug test cups. Internal Officers also leaked information pertaining to the drug test cups stating;**"Per Warden Terry McCann;s orders we have to write up disciplinary tickets regardless if we know when conduc-ting drug test that a false positive was given by test cups and if inmates have a problem with it ,grieve it".**

7) After hearing such information from the general prison talk and medical staff.Plaintiff then proceeded to investigate himself such statements to grieve his complaint through the proper proce-dure on May 3,2007.(See **Exhibit 4**)

8) Plaintiff was then informed by inmate Vernard Crocket #R55945 that he wrote the "National Alliance Against Racist and Political Repression/Chicago Branch at 1325 S.Wabash Ave.Suit 105,Chicago,IL 60605.To seek help for his similar issue with the drug testing as plaintiff on May 28,2007.Mr.Vernard Crocket received a reply from Co-chair person of the NAARPR Mr.Ted Pearson on June 18,2007.(See Exhibit 7)Enclosed was the official instruction sheet published by Phamatech,Inc regarding the correct use of the "Quick Screen Cup Multi Drug Screening Test",as well as the instruction sheet from Express Diagnostics Int'l,the manufacturer of the Drug Check 5 Test Cup.(See Exhibit 9)

9) In Mr.Ted Pearson's reply,he also stated that he personaly spoke with Les Wilson a spokesman for Express Diagnostics,the vendor of the Drug Check 5 Test Cup over the telephone,Mr.Wilson stated that the IDOC had decided to accept the results of the Drug Check 5 Test Cup as final,against the advice of the Company. Mr.Wilson also said the reason they gave for this is the cost of supplemental test.(See Exhibit 7)

10) Upon information and belief,in Mr.Ted pearson's letter to Mr. Vernard Crocket,Mr.Pearson states he also spoke with IDOC Director Roger Walker's office about the serious matter of the current drug testing method at Stateville C.C.Mr.Walkers secretary,Margaret, said she would bring this matter to the attention of the Director and Mr.Pearson was transferred to Warden Terry McCann's office at Stateville C.C.Katy,Warden Terry McCann's secretary,said she would also inform Mr.McCann of the issue.(See exhibit 7)

11) As stated in point 7,plaintiff filed a grievance in regards to the urinalysis May 3,2007.Plaintiff received a responce on May 10,2007 from Grievance Officer Ami Workman,denying grievance and relief to plaintiff per Lt.Edwards recommendation.On May 17, 2007 Warden Terry McCann concurred with the decision.(See Exhibit 5 )

12) Plaintiff Alann Vega appealed to the Administrative Review Board Office of Inmate Issues.Plaintiffs grievance was received on May 29,2007.The ARB office determined plaintiff's issue would be addressed without a formal hearing.(See Exhibit 6)

13) ARB office reviewed plaintiff's grievance on June 25,2007 and plaintiff's claims that the testing cup's are unreliable.Defendant Sherry Benton recommendent that grievance and relief requested by plaintiff be denied.Director Roger E.Walker Jr. concurred the recommendation.

14) Having exhausted all Administrative remedies,plaintiff wrote
a letter to the NAARPR Mr.Ted Pearson himself on September 23,2007
to request relevant information that was provided to inmate Vernard
Crocket,in regards to the "**Quick Screen Drug Test Cup**" from -
Mr.Ted Pearson  on December 26,2007.

15) Plaintiff later received all the available information
pertaining to the **Quick Screen Drug Test Cup** from Mr.Ted Pearson
on December 26,2007.(**See Exhibit 8 & 9**)

16) Defendant Roger E.Walker Jr.,Terry McCann,Darryl Johnson,Anna
Dockery,Ami Worman,Lieutenant Edwards,Sherry Benton and officer
Othello L.Hamilton's refusal to do anything about the shabby quality
of the drug testing method used on plaintiff.Purposefully ignoring
and turning a blind eye to the damages being cause to plaintiff
by the use of this primitive drug testing method,knowing  that an
injury done by a false positive can never be undone;amounts to
malicious deliberate and callous indifference.

17) Defedant Terry McCann,Lt.Buzinsci and Lt.Vaughn'allowed plaintiff
to be celled in a unsanitary cell conditions,a filthy cell,which
had accumulated feces in his toilet,bitter and brown driking water,
cell infested with roaches,spiders and dust mites,which bit him,
his windows were broken and it was extremely cold,it rained in his
cell through the ceiling and walls.mold was growing all over the
walls  of his cell,and these conditions caused him sinus problems,
severe headches,chest pains,vomiting,mental and emotional distress.
Plaintiff was also denied cleaning supplies to clean his cell,and
plaintiff was celled in segregation under these adverse conditions
for a period of 6 months.As a direct result of a urinalysis test,
which all of the above listed defendants were well aware of.was
defective,and whos test results simply could not be relied upon,yet
all of the above listed defendants **willfully** and **sadisticly sought
out to downplay** and **conceal** the defective urinalysis test being
implimented by the I.D.O.C,and deliberately sought out to subject
the plaintiff to cruel and unusual punishment,and the implimentation
of unlawfull sanctions.

8

VI.  Relief:

    The plaintiff is requesting $100,00.00 in actual,monitary,
compensatory,mental,emotional,psychological,pain,and suffering,and
$250,00.00 in punitive damages.

VII. The plaintiff demands that the case be tried by a jury.[X]Yes

### CERTIFICATION

By signing this Complaint,I
certify that the facts stated
in this Complaint are true to
the best of my knowledge,infor-
mation and belief.I understand
that if this certification is
not correct,I may be subject
to sanctions by the Court.

Signed this 27 day of July,2008

Alann Vega Reg.No.R-04203
PO Box 112
Joliet,IL 60434

9

Exhibit

ILLINOIS DEPARTMENT OF CORRECTIONS
**Offender Disciplinary Report**

Date: _3-23-07_

**Type of Report:**
☒ Disciplinary          Facility                    F-219
☐ Investigative

**Offender Information:**
Offender Name: _Vega Allen_                ID #: _R04303_

**Offense Information:**
Observation Date: _3-18-07_      Approximate Time: _7:15_   ☐ a.m.  ☒ p.m.
Location: _E House_

**Offense(s): DR 504:** _203 - Drug and Drug Paraphernalia_

**Summary of facts supporting violation:** (NOTE: Each offense identified above must be substantiated.)

_On the above date and approximate time
this R/O conducted a urinalysis test of
Im Vega Allen R04303 utilizing a Quick Screen
Cup 5. Im Vega provided a urine sample
that registered positive in the test cup
for THC. Attached is a copy of the
DC1182 of the test results. BOR_

**Witness(es):**

| Witness Name | Witness ID | Witness Type (Staff/Offender/Visitor) |
|---|---|---|
| | | |
| | | |
| | | |

☐ Check if DOC 0316 is attached to describe additional facts, observations or witnesses.

*Do not write below this line.*

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

DOC 0317 (Eff. 8/2005)
(Replaces DC 7205)

Distribution:  Master File
Offender
Facility (2)

Vega KO4302 Exhibit 2

STA-F-02-19

ILLINOIS DEPARTMENT OF CORRECTIONS

**Offender Disciplinary Report**

**Reporting Employee Information:**

| | | | | |
|---|---|---|---|---|
| _O. Hamilton_ | _N685_ | _O. Hamilton_ | _3/28/07_ | _10:40_ ☐ a.m. ☑ p.m. |
| Print Name | Badge # | Signature | Date | Time |

**Disciplinary Action:**

**Shift Review**

☑ Temporary Confinement    ☐ Investigative Status    Reasons: _Nature of Report_

| | | |
|---|---|---|
| _Major J. Hames #541_ | _signature_ | _3/29/07_ |
| Printed Name and Badge # | Shift Supervisor's Signature (For Transition Centers, Chief Administrative Officer) | Date |

**Reviewing Officer's Decision**

☐ Confinement reviewed by Reviewing Officer    Comment:_____

☑ Major Infraction, submitted for Hearing Investigator, if necessary and to Adjustment Committee
☐ Minor Infraction, submitted to Program Unit

| | | |
|---|---|---|
| _I AKB 507_ | _signature_ | _4/3/7_ |
| Print Reviewing Officer's Name and Badge # | Reviewing Officer's Signature | Date |

☑ Hearing Investigator's Review Required (Adult Correctional Facility Major Reports Only):

| | | |
|---|---|---|
| _C. Johnson_ | _signature_ | _4/3/07_ |
| Print Hearing Investigator's Name and Badge # | Hearing Investigator's Signature | Date |

**Procedures Applicable to all Hearings on Investigative and Disciplinary Reports**

You have the right to appear and present a written or oral statement or explanation concerning the charges. You may present relevant physical material such as records or documents.

**Procedures Applicable to Hearings Conducted by the Adjustment Committee on Disciplinary Reports**

You may ask that witnesses be interviewed and, if necessary and relevant, they may be called to testify during your hearing. You may ask that witnesses be questioned along lines you suggest. You must indicate in advance of the hearing the witnesses you wish to have interviewed and specify what they could testify to by filling out the appropriate space on this form, tearing it off, and returning it to the Adjustment Committee. You may have staff assistance if you are unable to prepare a defense. You may request a reasonable extension of time to prepare for your hearing.

| | |
|---|---|
| _X Mann Vega_ | _K04302_ |
| Offender's Signature | ID# |

☐ Check if offender refused to sign

**Serving Employee**

| | | |
|---|---|---|
| _X J. Johnson_ | _2117_ | _J. Johnson_ |
| Print Name | Badge # | Signature ☐ a.m. ☐ p.m. |

| | |
|---|---|
| _4/4/07_ | _1:01_ |
| Date Served | Time Served |

☐ I hereby agree to waive 24-hour notice of charges prior to the disciplinary hearing.

| | |
|---|---|
| _____ | _____ |
| Offender's Signature | ID# |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**(Detach and Return to the Adjustment Committee or Program Unit Prior to the Hearing)**

| | | |
|---|---|---|
| _____ | _____ | _____ |
| Date of Disciplinary Report | Print offender's name | ID# |

I am requesting that the Adjustment Committee or Program Unit consider calling the following witnesses regarding the Disciplinary Report of the above date:

**Witness Information:**

| | | | |
|---|---|---|---|
| _____ | _____ | _____ | _____ |
| Print Name of witness | Witness badge or ID# | Assigned Cell (if applicable) | Title (if applicable) |
| _____ | _____ | _____ | _____ |
| Print Name of witness | Witness badge or ID# | Assigned Cell (if applicable) | Title (if applicable) |
| _____ | _____ | _____ | _____ |
| Print Name of witness | Witness badge or ID# | Assigned Cell (if applicable) | Title (if applicable) |

DOC 0317 (Eff. 8/2006)
(Replaces DC 7205)

Distribution:  Master File
Offender
Facility (2)

## ADJUSTMENT COMMITTEE
## FINAL SUMMARY REPORT

| | | | | | |
|---|---|---|---|---|---|
| Name: VEGA, ALANN | | IDOC Number: R04203 | | | Race: HSP |
| Hearing Date/Time: 4/10/2007  10:21 AM | | Living Unit: STA-F-02-19 | | | Orientation Status: N/A |
| Incident Number: 200700642/1 - STA | | Status: Final | | | |

| Date | Ticket # | Incident Officer | Location | | Time |
|---|---|---|---|---|---|
| 3/28/2007 | 200700642/1-STA | HAMILTON, OTHELLO L | E-HOUSE | | 07:15 PM |

| Offense | Violation | | Final Result | |
|---|---|---|---|---|
| 203 | Drugs & Drug Paraphernalia | | Guilty | |
| | *Comments:TESTED POSITIVE FOR THC* | | | |

| Witness Type | Witness ID | Witness Name | Witness Status | |
|---|---|---|---|---|

No Witness Requested

### RECORD OF PROCEEDINGS
INMATE PRESENT, HEARING CONDUCTED, REPORT READ. INMATE STATES HE DID PROVIDE HIS URINE FOR A DRUG TEST BUT NEVER USED DRUG AFTER BEING LOCKED OF FOR 7 YRS. STATES HE DOES NOT TAKE ANY MEDICATION.

### BASIS FOR DECISION
1. OTS REPORTS HE DID RESIDE IN CELL UNIT-E ON THE INCIDENT DATE.
2. REPORTING STAFF PROVIDED A COMMITTEE A DC 1182 WHICH INDICATE INMATE DID PROVIDED HIS URINE FOR THE PURPOSE OF A DRUG TEST AND DID TEST POSITIVE FOR THC. INMATE WAS GIVEN WATER AT 7:45PM, 8:15PM BY THE REPORTING STAFF.
3. INMATE AT HIS DR HEARING STATES HE DOES NOT TAKE ANY MEDICATIONS.
4. BUS. MANAGER KEN HARRIS LIST THE COST OF (1) TEST CUP 5 AT $7.88.

### DISCIPLINARY ACTION  *(Consecutive to any priors)*

| RECOMMENDED | FINAL |
|---|---|
| 6 Months C Grade | 6 Months C Grade |
| 6 Months Segregation | 6 Months Segregation |
| Revoke GCC or SGT 6 Months | Revoke GCC or SGT 6 Months |
| Restitution of $ 7.88 Paid to IDOC / TEST CUP | Restitution of $ 7.88 Paid to IDOC / TEST CUP |
| 6 Months Contact Visits Restriction | 6 Months Contact Visits Restriction |
| 6 Months Commissary Restriction | 6 Months Commissary Restriction |
| Basis for Discipline:SERIOUS NATURE / DRUG USE | |

### Signatures
**Hearing Committee**

| | | | |
|---|---|---|---|
| JOHNSON, DARRYL L  - Chair Person | | 04/10/07 | BLK |
| | Signature | Date | Race |
| DOCKERY, ANNA M | | 04/10/07 | WHI |
| | Signature | Date | Race |

Recommended Action Approved

**Final Comments:** N/A

# STATE OF ILLINOIS - DEPARTMENT OF CORRECTIONS
## ADJUSTMENT COMMITTEE
## FINAL SUMMARY REPORT

| | | |
|---|---|---|
| **Name:** VEGA, ALANN | **IDOC Number:** R04203 | **Race:** HSP |
| **Hearing Date/Time:** 4/10/2007  10:21 AM | **Living Unit:** STA-F-02-19 | **Orientation Status:** N/A |
| **Incident Number:** 200700642/1 - STA | **Status:** Final | |

---

TERRY L MCCANN / TLM  4/23/2007

| | 04/23/07 |
|---|---|
| Chief Administrative Officer | **Signature**　　　　　**Date** |

The committed person has the right to appeal an adverse decision through the grievance procedure established by Department Rule 504: Subpart F.

CLEO JOHNSON

| | 4/24/2007 | 02:00 PM |
|---|---|---|
| Employee Serving Copy to Committed Person | **When Served - - Date and Time** | |

**OFFENDER'S GRIEVANCE**

| Date: 5-03-07 | Offender: (Please Print) VEGA ALANN | ID#: R04203 |
|---|---|---|

Present Facility: Stateville C.C.     Facility where grievance Issue occurred: Stateville C.C. E-House

*(stamp: Received Grievance Office MAY 9 2007 0420 STA)*

**NATURE OF GRIEVANCE:**

- ☐ Personal Property
- ☐ Staff Conduct
- ☐ Transfer Denial by Facility
- ☑ Disciplinary Report: 3-28-07
  Date of Report

- ☐ Mail Handling
- ☐ Dietary
- ☐ Transfer Denial by Transfer Coordinator

- ☐ Restoration of Good Time
- ☐ Medical Treatment

- ☐ Disability
- ☐ HIPAA
- ☑ Other (specify): Urinalysis

Stateville C.C. E-house
Facility where issued

**Note:** Protective Custody Denials may be grieved immediately via the local administration on the protective custody status notification.

**Complete:** Attach a copy of any pertinent document (such as a Disciplinary Report, Shakedown Record, etc.) and send to:

    Counselor, unless the issue involves discipline, is deemed an emergency, or is subject to direct review by the Administrative Review Board.
    Grievance Officer, only if the issue involves discipline at the present facility or issue not resolved by Counselor.
    Chief Administrative Officer, only if EMERGENCY grievance.
    Administrative Review Board, only if the issue involves transfer denial by the Transfer Coordinator, protective custody, involuntary administration of psychotropic drugs, issues from another facility except personal property issues, or issues not resolved by the Chief Administrative Officer.

**Brief Summary of Grievance:** This grievant presents for review the urinalysis drug test procedure that was conducted by officer O. Hamilton #12685. The fact that reporting officer did not follow all IDOC protocol procedure and policies as it relates to the random drug testing, noticeable in the disciplinary report in violation of this grievants procedural due process right. On March 28 2007 this grievant was escorted from Edwars housing unit 908 to F-house segregation for the alleged offense of 203 Drug and drug paraphernalia. Inmate Vega #R04203 was ordered to submit to a random drug test in which he fully complied and provided the minimal allowed level of urine in a "Quick Screen 5 drug test cup." Said report indicated that reporting employee read a positive reading for THC.

**Relief Requested:** Urine evidence to be reviewed by a Medical Review Officer, experience in drug abuse & forensic science to prove "false positive." Blood test; immediate release from seg. and guilty finding to be expunged. Thank you.

- ☐ Check only if this is an EMERGENCY grievance due to a substantial risk of imminent personal injury or other serious or irreparable harm to self.

| Offender's Signature | R04203 ID# | 5, 03, 07 Date |
|---|---|---|

(Continue on reverse side if necessary)

---

**Counselor's Response (if applicable)**

Date Received: ___/___/___

☐ Send directly to Grievance Officer    ☐ Outside jurisdiction of this facility. Send to Administrative Review Board, P.O. Box 19277, Springfield, IL 62794-9277

Response: _____

| Print Counselor's Name | Counselor's Signature | Date of Response |
|---|---|---|

---

**EMERGENCY REVIEW**

Date Received: ___/___/___

Is this determined to be of an emergency nature?

☐ Yes; expedite emergency grievance
☐ No; an emergency is not substantiated. Offender should submit this grievance in the normal manner.

| Chief Administrative Officer's Signature | | Date |
|---|---|---|

— no witnesses stated. This grievant first presents the fact that reporting employee did not take all the proper procedures as clearly seen in the report in question that relates to the drug test authorize by Springfield. Reporting staff did not place this grievants under investigation and submitted grievants urine sample to a laboratory for further testing to concur a positive reading for THE or a false positive. If we value the rights of the innocent inmates and employees, we should question a technology which is apparently wrong about up to half the people it "catches". There are a myriad of weapons useable in war on drugs, but there is one weapon that is inappropriate such as utilizing the "Quick Screen Cup 5 test", because it harms more innocent victims than the real offenders. The current state of science for random drug testing is too primitive for use in a system that respects the rights of innocent people. Until technology improves drug tests will injure the innocent more than they will identify the guilty. Simply put, false positives are the result of the imprecision of current testing methods, and the known shoddy quality of the "Quick Screen Cup 5". The reasoning herein makes no case for drug decriminalization. However, IDOC should not tolerate a practice that accused the innocent as often as it accused the guilty. The injury done by a false positive could never be undone. Congress outlawed the use of polygraphs, in order to protect people from false accusations. Drug testing is like polygraph testing. Both are used to find guilty people. But both polygraph testing and urine testing result in huge numbers of false accusations against innocent people. It is known that false positives can arise from many patent medicines, baker's poppy seed, even natural body enzymes. Congress decided that lie detectors foster injustice rather than justice; the same appears to of drug testing with this current state of the art. Testing procedures should conform to the highest and most reliable scientifically accepted standars. Testing should reduce to an absolute minimum the false positives caused by natural body chemicals such as melanin. The urinalysis drug test reading's in question were not interpret responsibly by R/o. The Federal testing programs require all test results be reviewed by a Medical Review Officer rather than a regular employee before disclosure to the inmate. The Medical Review Officer should be a physician with experience in drug abuse and Forensic Science, who can accurately assess the significance of test results. Quick Screen Cup 5 drug test company should act responsibly for the damages to people they injure by the un-reliability of their product used in drug testing. Cheap, non-sensitive reagent, outdated test cups, defective or damaged equipment is also improperly operated by staff. Overworked and fatigue employees along with pressure to produce more work in less time are in conjunction for inaccurate reading. Employees are either inadequately trained or lack experienced, the environment where such testing is conducted is poorly adequate, causing bacterial contamination. It is appearant that the adjustment committee simply adopted the reporting employee's version of the events without the physical evidence require. This grievant was entitled to due process of law and to an adequate disciplinary hearing when he was faced to grievous loss – such as penalties which include —7

- Segregation confinement. Grievant has consistently maintained a clear record of any 203 drug and drug paraphernalia infractions throughout his years of incarceration and fervently maintains his claim of innocence in the alleged charge in question.

Unconstitutional conduct by all the above parties justifies expungement of the guilty finding; Finney v. Mabry 455 F. supp. 756; Aikens v. bush, 514 E. 2d 55; Harlow v. Fitzgerald 457 U.S. 800; Finney

EOR.

Note: Grievant requested a second urinalysis test immediately after the first reading was given to prove his absolute innocence and inaccuracy of the first drug test results but his request was refused by B/O.

ILLINOIS DEPARTMENT OF CORRECTIONS
**RESPONSE TO COMMITTED PERSON'S GRIEVANCE**

| Grievance Officer's Report | | |
|---|---|---|
| Date Received: May 9, 2007 | Date of Review: May 10, 2007 | Grievance # (optional): 0420 |
| Committed Person: Alena Vega | | ID#: R04203 |

**Nature of Grievance:** Other-Urinalysis; Disciplinary Rpt: 3-28-07, Sta CC

**Facts Reviewed:** Grievant alleges that he was given a ticket for testing positive for THC. Grievant states the Quick Screen Cup 5 test harms more innocent victims than the offenders.

Upon further review from Grievance Office, finds that per Lt. Edwards, all procedures were followed during the procedure of the drug testing. Unable to substantiate claims of staff misconduct. Disciplinary report will be upheld, sanctions are within range of Adjustment Committee.

**Recommendation:** Grievance is denied.

Ami Workman
_____
Print Grievance Officer's Name                    Grievance Officer's Signature
(Attach a copy of Committed Person's Grievance, including counselor's response if applicable)

| Chief Administrative Officer's Response | | |
|---|---|---|
| Date Received: 5-17-07 | ☒ I concur    ☐ I do not concur | ☐ Remand |

Comments:

W. McCann
_____                    5-17-07
Chief Administrative Officer's Signature                    Date

| Committed Person's Appeal To The Director |
|---|

I am appealing the Chief Administrative Officer's decision to the Director. I understand this appeal must be submitted within 30 days after the date of the Chief Administrative Officer's decision to the Administrative Review Board, P.O. Box 19277, Springfield, IL 62794-9277. (Attach a complete copy of the original grievance, including the counselor's response, if applicable, and any pertinent documents.)

_____         _____         _____
Committed Person's Signature                    ID#                    Date

**Rod R. Blagojevich**
Governor

## Illinois
### Department of
## Corrections

**Roger E. Walker Jr.**
Director

1301 Concordia Court / P.O. Box 19277/ Springfield, IL  62794-9277 / Telephone: (217) 522-2666 / TDD: (800) 526-0844

June 25, 2007

Alann Vega
Register No. R04203
Stateville Correctional Center

Dear Mr. Vega:

This is in response to your grievance received on May 29, 2007, regarding a disciplinary report dated March 28, 2007, which was alleged to have occurred at Stateville Correctional Center.  This office has determined the issue will be addressed without a formal hearing.

This office has reviewed your written grievance dated May 3, 2007 regarding the above issued disciplinary report and claims that the testing cup is unreliable.

The Grievance officer's report (0420) and subsequent recommendation dated May 10, 2007 and approval by the Chief Administrative Officer on May 17, 2007 have been reviewed.

This office reviewed the disciplinary report written on March 28, 2007 by Officer Hamilton citing you for the offense of 203-Drugs & Drug Paraphernalia.

The Stateville Adjustment Committee reviewed the report (200700642/1-STA) April 10, 2007 and found you guilty of the charge. Recommended discipline was: Demotion to C grade 6 months, Segregation 6 months, Revoke GCC or SGT 6 months, Loss of Contact Visits 6 months, Loss of Commissary 6 months and Restitution for Test Cup $7.88. The Chief Administrative Officer concurred with the recommendation on April 23, 2007. Prior to this review, the revocation was reduced to 3 months and is currently pending before the Prisoner Review Board.

Based on a review of all available information and a compliance check of the procedural due process safeguards outlined in Department Rule 504, this office is reasonably satisfied you committed the offense and recommends the grievance and relief requested be denied.

FOR THE BOARD: _____
Sherry Benton
Administrative Review Board
Office of Inmate Issues

CONCURRED: _____
Roger E. Walker Jr.
Director

cc:   Warden Terry McCann, Stateville Correctional Center
Alann Vega, Register No. R04203



# National Alliance Against Racist & Political Repression/Chicago Branch
1325 S. Wabash Ave. Suite 105, Chicago, Illinois 60605 (312) 939-2750
www.naarpr.org

June 18, 2007

Mr. Vernard Crockett, R55945
Stateville Correctional Center
Route 53
P.O. Box 112
Joliet, Il 60434

Dear Mr. Crockett,

We've received your letter of May 28, 2007, and your mom, Mrs. Evelyn Crockett, called us about your situation last week. For your information I'm enclosing the official instruction sheet pulished by Phamatech, Inc, regarding the correct use of the "QuickScreen™ Cup Multi Drug Screening Test.", as well as the instruction sheet from Express Diagnostics Int'l, the manufacturer of the DrugCheck 5 Test Cup. Note that both clearly state that the test provides only a preliminary test result, and that a more specific alternate testing method must be used to confirm those results.

I spoke with Les Wilson, a spokesman for Express Diagnostics, the vendor of the DrugCheck 5 Test Cup, on the telephone a few weeks ago. Wilson said that the IDOC has decided to accept the results of the DrugCheck 5 Test Cup as final, against the advice of the company. He said the reason they gave for this for this is the cost of supplemental tests. He also said that the test results are stable up to 30 minutes, and should not change from negative to positive.

I have also spoken with IDOC Director Roger Walker's office about this matter. Mr. Walker's Secretary, Margaret, said she'll bring this to the attention of the Director, and she transferred me to Warden Terry McCann's office at Stateville. Katy, Warden McCann's secretary, said that she'll inform Mr. McCann of the issue.

You will want to file a grievance on this issue, if you haven't already, and if it is denied you may file an appeal with Springfield. It should be possible for the finding against you to be reversed and your privileges restored.

Please send us copies of grievances and appeals that you file, and we will try to stay on top of this issue.

Thank you very much. We all wish you the best, and we'll stay in touch.

Yours, in struggle,

Ted Pearson

CC:
Mrs. Evelyn Crockett

Chicago IL 60620

Shaena Fazal
Long Term Prisoner Policy Project
John Howard Association

300 W. Adams St.
Chicago IL 60606
Via email

Bill Ryan
Citizens for Earned Release
Via email

---

**◆ Steering Committee**

Clarice Durham
Ted Pearson
　　　*Co-Chairs*

Josephine Wyatt
　　　*Treasurer*
　　　*Finance Chair*

Elizabeth Benson
　　　*Membership*
　　　*Secretary*

Norman Roth
　　　*Labor Outreach*

---

UNITY + STRUGGLE + ORGANIZATION = VICTORIES!

## National Alliance Against Racist & Political Repression/Chicago Branch

1325 S. Wabash Ave. Suite 105, Chicago, Illinois 60605 (312) 939-2750

www.naarpr.org

**Steering Committee**

Clarice Durham
Ted Pearson
        Co-Chairs

Josephine Wyatt
        Treasurer
        Finance Chair

Elizabeth Benson
        Membership
        Secretary

Norman Roth
        Labor Outreach

Kevin Lindemann
        Rec'g Secretary

Gloria J. Johnson-Ester
        At large

Virginia Clements
        At large

December 26, 2007

Mr. Alann Vega, R04203
Stateville Correctional Center
Route 53
P.O. Box 112
Joliet, Il 60434

Dear Mr. Vega,

Thank you for your letter dated September 23, 2007. We are continuing to gather data regarding the Illinois Department of Corrections health care system and its failings. Please accept my apologies that we are not able to address specific personal requests directly in most cases – the volume of mail is just too large and the number of volunteers we have working on this project is just too small.

Enclosed please find a copy of the Quick Screen Drug test you requested. I've spoken with a spokesman for Express Diagnostics, the vendor of the DrugCheck 5 Test Cup. He said that the IDOC has decided to accept the results of the DrugCheck 5 Test Cup as final, against the advice of the company. He said the reason they gave for this is the cost of supplemental tests. I've also spoken with IDOC Director Roger Walker's office about this matter. Mr. Walker's Secretary said she'll bring this to the attention of the Director. You should file a grievance on this issue if you haven't already, and you can appeal a denial of your grievance to the Administrative Review Board in Springfield.

We have received your release form, but are still awaiting the actual records, which always take a long time from Stateville.

Please do keep us informed regarding your care and your condition. Even if we can't address your specific questions we will include all your correspondence and documentation in your file, and it will be reviewed along with your medical records.

Thank you very much.

Yours, in struggle,

Ted Pearson

UNITY + STRUGGLE + ORGANIZATION = VICTORIES!

# DRUGCHECK® 5 TEST CUP
NO STEP - ONSITE
Catalog #46920
Instructions

## INTENDED USE

The DRUGCHECK® 5 Test Cup is an immunochromatographic assay for rapid quali-tative detection of five drugs and their principal metabolites in urine at specified cutoff concentrations. This five drug combination is composed from the following drugs:

| | |
|---|---|
| MARIJUANA (THC) | 50 ng/ml |
| COCAINE (BENZOYLECGONINE) | 300 ng/ml |
| AMPHETAMINE | 1000 ng/ml |
| METHAMPHETAMINE | 1000 ng/ml |
| OPIATES | 2000 ng/ml |

*Note: The test provides only preliminary test data which should be confirmed by other methods such as gas chromatography/mass spectrometry (GC/MS). Clinical considerations and profes-sional judgment should be applied to any drug of abuse test result, particularly when prelimi-nary positive results are indicated.*

## SUMMARY AND EXPLANATION OF THE TEST

The DRUGCHECK® 5 Test Cup uses an easy, fast, qualitative, visually read com-petitive binding immunoassay method for screening without the need for instru-mentation. The method employs a unique mixture of antibodies to selectively iden-tify the drugs of abuse and their metabolites in test samples with a high degree of sensitivity.

Drug abuse remains a growing social and economic concern in many developed and developing countries throughout the world. The above stated drugs are among the most frequently abused illicit drugs according to the U.S. Substance Abuse and Mental Health Services Administration (SAMHSA) and the U.S. Department of Health and Human Services.

## PRINCIPLE OF THE TEST

The DRUGCHECK® 5 Test Cup is a competitive binding immunoassay in which drugs and drug metabolites in a urine sample compete with immobilized drug con-jugate for limited labeled antibody binding sites. By utilizing antibodies that are specific to different drug classes, the test permits independent, simultaneous detec-tion of five drugs from a single urine sample. The approximate run time is 5 min-utes.

In the assay procedure, urine mixes with labeled antibody-dye conjugate and mi-grates along a porous membrane. When the concentration of a given drug is below the detection limit of the test, unbound antibody-dye conjugate binds to antigen conjugate immobilized on the membrane, producing a rose-pink color band in the appropriate Test Zone for that drug. Conversely, when the drug level is at or above the detection limit, free drug competes with the immobilized antigen conjugate on the membrane by binding to antibody-dye conjugate, forming an antigen-antibody complex and preventing the development of a rose-pink color band in the Test Zone.

Regardless of the drug levels in the sample, a rose-pink color band is produced in each Control Zone by a parallel immunochemical reaction. These bands serve as built-in quality control measures by demonstrating antibody recognition and veri-fying that the reagents are chemically active.

## MATERIALS PROVIDED

1. Test Devices containing dye-conjugated antibody and immobilized antigen in a protein matrix with sodium azide.

2. Test Instructions.

   *Note: You may need to provide a clock or timing device to accurately determine when to read the test.*

## WARNINGS AND PRECAUTIONS

1. For *in vitro* diagnostic and professional use only.

2. Do not use the test device beyond the expiration date.

3. Use a new device for each urine test to avoid cross contamination of urine samples. The DRUGCHECK® 5 Test Cup cannot be reused.

4. Urine specimens may be infectious; properly handle and dispose of all urine and urine reaction devices in a biohazard container.

5. Visually inspect the foil package to ensure it has not been compromised before beginning the test. If the package does not reach you intact, the integrity of the test cup may be compromised.

## STORAGE AND STABILITY

Store test kit below 28°C (83°F); do not freeze. If stored at 2°-8°C (36°F-46°F), allow the test kit to reach room temperature (15°-28°C; 59°-83°F) before performing the test. The Test Cup will be stable until the expiration date as printed on the foil pack-age.

## SPECIMEN COLLECTION AND PREPARATION

Fresh urine specimens should be collected directly into the cup and do not require any special handling or pre-treatment. The DRUGCHECK® 5 Test Cup employs a thermal strip to validate the urine collection. This device should be checked imme-diately after collection.

*Note: Urine specimens can be transferred from a urine collection container into the DRUGCHECK® 5 Test Cup, if necessary.*

## TEST PROCEDURE

*Do not break the seal of the protective pouch until ready to begin testing.*

1. Tear open the foil pouch and remove the test cup.

2. Issue the device to the individual to be tested.

3. Have them urinate directly into the DRUGCHECK® 5 Test Cup. Ensure the specimen is above the minimum level line on the test label.

4. The cup must be returned immediately to the collection site. Remove tear-off label and read the results at five minutes post collection.

   *NOTE: In order to prevent any incorrect results, the test results should not be interpreted after 8 minutes.*

## INTERPRETATION OF RESULTS



**Each of the tests is read individually and independently of one another.**

**Confirm:** A rose-pink color band is visible in each Control Zone. No color band whatsoever appears in the appropriate Test Zone, indicating a preliminary positive result for the corresponding drug of that specific Test Zone. Send this urine speci-men to a certified laboratory for confirmation.

**Negative:** A rose-pink color band is visible in each Control Zone and in the appro-priate Test Zone, indicating that the concentration of the corresponding drug of that specific test zone is below the detection limit of the test.

**Retest:** If a color band is not visible in the Control Zone, the test is invalid. Another test should be run to re-evaluate the specimen. Each strip in the DRUGCHECK® 5 Test Cup is read and functions independently. An invalid result on one test strip does not invalidate other results derived from the same device.

*Note: There is no meaning attributed to line color intensity or width. Any evidence of a line should be considered a line.*

## QUALITY CONTROL

An internal procedure control has been incorporated into the test to ensure proper kit performance and reliability.

## LIMITATIONS OF THE TEST

1. This product is designed to be used for the detection of drugs of abuse and their metabolites in human urine only.

2. Although the test is very accurate in detecting the urine drug levels (accuracy is a function of the specific strip) there is the possibility false results will occur due to the presence of interfering substances in the urine and/or factors beyond the control of the manufacturer, e.g. technical or procedure errors as-sociated with the testing.

3. The test is a qualitative screening assay and is not suggested for quantitative determination of drug levels or level of intoxication.

4. Adulterants such as bleach or other strong oxidizing agents can cause errone-ous test results when added to urine specimens regardless of the analysis method used. If adulteration is suspected, obtain another urine specimen.

## PERFORMANCE CHARACTERISTICS

1. **Sensitivity:** The DRUGCHECK® 5 Test Cup detects drugs of abuse and their major metabolites in urine at concentrations equal to or greater than the cut-off level for the specific drug, which is suggested by the U.S. Substance Abuse and Mental Health Services Administration (SAMHSA) for the immunoassay method.

2. **Precision:** The DRUGCHECK® 5 Test Cup produced a 100% precision level when tested with drug standards at 50% above and 50% below cutoff concentration levels.

The precision was determined by replicate assays with kits from three different production lots. The resultant data indicated 100% precision for the duplicates within each lot and no appreciable interlot variation when testing both positive and negative spiked samples across three (3) different lots of devices.

3. **Accuracy:** In addition to in-house performance testing, where there were no inappropriate reactions and there was no interaction between any of the strips, clinical trials of at least 101 clinical specimens were conducted. During these trials, the clinical specimens were evaluated using the DRUGCHECK® 5 Test Cup, the Applied Biotech, Inc. SureStep™ drug screen, and GC/MS.

The individual results from the study are as follows:

3.1 Marijuana (THC)

|  | SureStep Positive | SureStep Negative |
|---|---|---|
| DRUGCHECK® Positive | 83 | 0 |
| DRUGCHECK® Negative | 0 | 47 |

When compared to SureStep™ the relative sensitivity between positive samples was 100%. The relative specificity between negative samples was 100%. The accuracy with respect to SureStep™ was 100%.

|  | GC/MS Positive | GC/MS Negative |
|---|---|---|
| DRUGCHECK® Positive | 83 | 0 |
| DRUGCHECK® Negative | 0 | 47 |

When compared with GC/MS, the relative sensitivity between positive samples was 100%. The relative specificity between negative samples was 100%. The accuracy with respect to GC/MS was 100%.

3.2 Cocaine (COC)

|  | SureStep Positive | SureStep Negative |
|---|---|---|
| DRUGCHECK® Positive | 96 | 0 |
| DRUGCHECK® Negative | 0 | 35 |

When compared to SureStep™ the relative sensitivity between positive samples was 100%. The relative specificity between negative samples was 100%. The accuracy with respect to SureStep™ was 100%.

|  | GC/MS Positive | GC/MS Negative |
|---|---|---|
| DRUGCHECK® Positive | 96 | 0 |
| DRUGCHECK® Negative | 0 | 35 |

When compared with GC/MS, the relative sensitivity between positive samples was 100%. The relative specificity between negative samples was 100%. The accuracy with respect to GC/MS was 100%.

3.3 Opiates (OPI)

|  | SureStep Positive | SureStep Negative |
|---|---|---|
| DRUGCHECK® Positive | 55 | 0 |
| DRUGCHECK® Negative | 2 | 58 |

When compared to SureStep™ the relative sensitivity between positive samples was 96.49%. The relative specificity between negative samples was 100%. The accuracy with respect to SureStep™ was 98.26%.

|  | GC/MS Positive | GC/MS Negative |
|---|---|---|
| DRUGCHECK® Positive | 56 | 1 |
| DRUGCHECK® Negative | 0 | 58 |

When compared with GC/MS, the relative sensitivity between positive samples was 100%. The relative specificity between negative samples was 98.28%. The accuracy with respect to GC/MS was 99.13%.

3.4 Amphetamine (AMP)

|  | SureStep Positive | SureStep Negative |
|---|---|---|
| DRUGCHECK® Positive | 49 | 0 |
| DRUGCHECK® Negative | 0 | 58 |

When compared to SureStep™ the relative sensitivity between positive samples was 100%. The relative specificity between negative samples was 100%. The accuracy with respect to SureStep™ was 100%.

|  | GC/MS Positive | GC/MS Negative |
|---|---|---|
| DRUGCHECK® Positive | 49 | 0 |
| DRUGCHECK® Negative | 0 | 58 |

When compared with GC/MS, the relative sensitivity between positive samples was 100%. The relative specificity between negative samples was 100%. The accuracy with respect to GC/MS was 100%.

3.5 Methamphetamine (MET)

|  | SureStep Positive | SureStep Negative |
|---|---|---|
| DRUGCHECK® Positive | 54 | 0 |
| DRUGCHECK® Negative | 0 | 47 |

When compared to SureStep™ the relative sensitivity between positive samples was 100%. The relative specificity between negative samples was 100%. The accuracy with respect to SureStep™ was 100%.

|  | GC/MS Positive | GC/MS Negative |
|---|---|---|
| DRUGCHECK® Positive | 54 | 0 |
| DRUGCHECK® Negative | 0 | 47 |

When compared with GC/MS, the relative sensitivity between positive samples was 100%. The relative specificity between negative samples was 100%. The accuracy with respect to GC/MS was 100%.

*There were no inappropriate reactions or cross-reactivity between strips noted in any of the data collected.*

4. **Specificity:** A study was conducted with the DRUGCHECK® 5 Test Cup to determine the cross-reactivity of drug-related compounds with the test. Substances listed in Table I produced results approximately equivalent to the cutoff levels. A separate study was conducted to determine the cross-reactivity of non-related compounds with the test at concentrations much higher than normally found in the urine of people using or abusing them. No cross-reactivity was detected with the substances listed in Table 2.

**Table 1: Concentrations of drug-related compounds showing positive response approximately equivalent to the cutoff set for the test:**

The following Opiate-related substances yield a positive result for Opiates:

| Morphine | 2,000 ng/ml | Oxycodone | 70,000 ng/ml |
|---|---|---|---|
| Codeine | 2,000 ng/ml | Hydrocodone | 10,000 ng/ml |
| Opiate | 2,000 ng/ml | Hydromorphone | 2,500 ng/ml |
| Ethyl Morphine | 2,000 ng/ml | | |

The following MET-related substances yield positive results for Methamphetamine:

| d-Methamphetamine | 1,000 ng/ml | (+/-)-Ephedrine | 50,000 ng/ml |
|---|---|---|---|
| d-Amphetamine | 50,000 ng/ml | b-Phenylethylamine | 50,000 ng/ml |
| Chloroquine | 50,000 ng/ml | Procaine | 10,000 ng/ml |
| l-Methamphetamine (1-Deoxyephedrine) | 25,000 ng/ml | Ranitidine | 50,000 ng/ml |
| 3,4 methylenedioxymethamphetamine (MDMA) | 2,000 ng/ml | | |

The following Marijuana-related substances yield positive results for Marijuana:

| 11-Nor-Δ-8-THC-9-COOH | 50 ng/ml | Δ-9-THC | 10,000 ng/ml |
|---|---|---|---|
| 11-Nor-Δ-9-THC-9-COOH | 50 ng/ml | Cannabinol | 100,000 ng/ml |
| Δ-8-THC | 7,500 ng/ml | 11-hydroxy-Δ-9-THC | 2,500 ng/ml |

The following Amphetamine-related substances yield positive results for Amphetamines:

| d-Amphetamine | 1,000 ng/ml |
|---|---|
| L-Amphetamine | 100,000 ng/ml |
| (±)3,4-Methylenedioxyamphetamine (MDA) | 5,000 ng/ml |

The following Cocaine-related substances yield positive results for Cocaine:

| Benzoylecgonine | 300 ng/ml |
|---|---|
| Cocaine | 300 ng/ml |
| Ecgonine | >100,000 ng/ml |
| Ecgonine Methyl Ester | >100,000 ng/ml |

**Table 2: Compounds tested and found not to cross-react with the test at a .1 mg/ml concentration in urine:**

Compounds which produce no reaction

| Acetaminophen | Creatine | Lidocaine |
|---|---|---|
| Acetone | Dextromethorphan | N-Methyl-Ephedrine |
| Albumin | 4-Dimethylaminoantipyrine | (+)-Naproxine |
| Amitriptyline | Dopamine | Penicillin-G |
| Ampicilin | (±)-Ephedrine | Pheniramine |
| Aspartame | Erythromycin | Phenothiazine |
| Aspirin | Ethanol | L-Phenylethylamine |
| Atropine | Furosemide | Quinidine |
| Benzocaine | Guaiacol Glyceryl Ether | Sulindac |
| Bilirubin | Hemoglobin | Tyramine |
| Caffeine | Imipramine | Vitamin C |
| Chlorpheniramine | Isoproterenol | |

**BIBLIOGRAPHY**

1. Baselt, R.C., Disposition of Toxic Drugs and Chemicals in Man, 2nd Ed., Biomedical Publ., Davis, CA, p. 488 (1982).
2. Cody, J.T., Schwarzhoff, R., J. Anal. Toxicol., 17: 2630 (1993).
3. Urine Testing for Drugs of Abuse, NIDA Research Monograph 73, (1986).
4. Dasguspta, A., Saldana, S., Kinnaman, G., Smith, M., Johansen, K., Clin. Chem., 39(1): 104-108 (1993).
5. Department of Health and Human Services, Fed. Regist., 53(69):19970-11989 (1988), (1989).
6. FDA Guidance for Labeling Urine Drugs of Abuse Screening Testing, Kshitij Mohan, 7/21/1987.

Phamatech, Inc., 9530 Padgett Street, Suite 101   San Diego, CA 92126 USA
(888) 635-5840 Toll- free   (858) 635-5843 fax    Internet: www.phamatech.com

# QuickScreen™ Cup Multi Drug Screening Test
## Catalog # 9177X-25
## Test Instructions

## Intended Use

The QuickScreen™ Cup Multi Drug Screening Test is a rapid, self-timed, qualitative immunoassay for the detection of drugs of abuse in urine. The cutoff concentrations for this test are PCP at 25 ng/mL, Amphetamine at 1000 ng/mL, THC metabolite (THCA) at 50 ng/mL, Cocaine metabolite (Benzoylecgonine) at 300 ng/mL and Opiates at 2,000 ng/mL. This assay is intended for professional use.

**This test provides only a preliminary test result. A more specific alternate testing method must be used in order to obtain a confirmed analytical result. Gas chromatography / mass spectrometry (GC/MS) is the preferred confirmatory method. Other chemical confirmation methods are available. Clinical consideration and professional judgment should be applied to any drug of abuse test result, particularly when preliminary positive results are observed.**

## Summary & Explanation of the Test

**Phencyclidine**, also known as "Angel Dust" or **PCP**, is used primarily as a recreational drug for its hallucinogenic effects. Commonly eaten, inhaled, smoked or injected, it is well absorbed by all routes of administration, concentrating fastest in fatty tissues and in the brain. Unchanged PCP is excreted in the urine in moderate amounts (10% of the dose). The terminal half-life for PCP varies considerably, ranging from 8 to 55 hours, averaging 18 hours. The effects of this drug are unpredictable and variable. Users may exhibit signs of euphoria, anxiety, relaxation, increased strength, time and space distortions, panic and hallucination.

**Amphetamine (AMP)** and its metabolites are central nervous system stimulants whose pharmacological properties include alertness, wakefulness, increased energy, reduced hunger and an overall feeling of well being. Large doses and extended usage can result in higher tolerance levels and physiological dependency. Both $d$ and $l$ forms of Amphetamine are controlled substances.

$^9$-Tetrahydrocannabinol (THC) is generally accepted to be the principle active component in marijuana and hashish, although other cannabinoids contribute to their physiological activity. THC is rapidly absorbed by inhalation and by the gastrointestinal tract, and is almost completely metabolized. Its predominant metabolite, 11-Nor- $^9$-THC-9-carboxylic Acid, or **THCA**, is found in the plasma, feces and urine along with other compounds. Low concentrations of THC may be detected in urine during the initial several hours, but THCA persists in urine at a detectable concentration for many days after smoking.

**Cocaine (COC)** is an alkaloid present in coca leaves (*Erythroxine coca*) whose pharmacological properties include alertness, wakefulness, increased energy and an overall feeling of euphoria. Cocaine has been used medicinally as a local anesthetic, however, its addictive properties have minimized its modern value as an anesthetic. Elimination of cocaine is predominantly controlled by its biotransformation. It is almost completely metabolized to Benzoylecgonine. Very low concentrations of Cocaine may be de-

1

tected in urine during the initial several hours, but Benzoylecgonine persists in urine at detectable concentrations for 48 hrs.

**Opiates (OPI 2000)** are addictive, pain-relieving narcotic drugs derived from the opium poppy (*Papaver somniferum*). An opiate is any natural or synthetic drug derived from this plant that has morphine-like pharmacological actions. Natural opiates include Codeine, Morphine and Thebaine. Synthetic opiates include Heroin, Hydrocodone and Levorphanol.

Urine based screening tests for drugs of abuse range from complex analytical procedures to simple immunoassay tests. The sensitivity and rapidity of immunoassays have made them the most accepted method of preliminary screening for drugs of abuse in urine. This allows the laboratory to eliminate the large number of negative specimens and focus on the smaller number of initially positive samples.

## Principle of the Procedure

The QuickScreen™ Cup Multi-Drug Screening Test is a competitive immunoassay that is used to screen for the presence of drugs of abuse in urine. It is a chromatographic absorbent device in which drugs or drug metabolites in a sample compete with drug / protein conjugate immobilized on a porous membrane for a limited number of antibody / dye conjugate binding sites. The test device employs a unique combination of monoclonal and polyclonal antibodies to selectively identify drugs of abuse in urine with a high degree of confidence. The test device also contains a self-timer that indicates when test results are ready to be interpreted.

In the procedure, a fresh urine sample is collected directly into the cup. The urine is absorbed into each test panel by capillary action, mixes with the antibody / dye conjugate, and flows across the pre-coated membrane. **When sample drug levels are below the target cutoff** (the detection sensitivity of the test), antibody / dye conjugate binds to the drug / protein conjugate immobilized in the Test Region (**T**) of the device. This produces a colored Test Band that, ***regardless of its intensity***, indicates a negative result.

**When sample drug levels are at or above the target cutoff,** the free drug in the sample binds to the antibody / dye conjugate, preventing the antibody / dye conjugate from binding to the drug / protein conjugate immobilized in the Test Region (**T**) of the device. This prevents the development of a distinct colored band, indicating a potentially positive sample.

In either case, a colored Control Band is produced in the Control Region (**C**) by a non-specific antibody-dye / conjugate reaction. This band serves as a built-in quality control device, demonstrating antibody recognition and reactivity as well as confirming that the test is complete.

## Reagents & Materials Supplied

1.  25 "Self-Timed" Test Cups (Cat. # 9177X). Separate test panels for each target drug contain:

    a.  Monoclonal anti-drug antibody / colloidal gold conjugate in a protein matrix containing 0.1% sodium azide coated in the sample path

    b.  Drug derivative / protein conjugate immobilized as a line in the Test Region (**T**)

    c.  Goat anti-mouse antibody immobilized as a line in the Control Region (**C**)

2.  Directional Insert (Cat. # 9177X-DI)

2

Phamatech, Inc., 9530 Padgett Street, Suite 101   San Diego, CA 92126 USA
(888) 635-5840 Toll- free   (858) 635-5843 fax    Internet: www.phamatech.com

## Warnings & Precautions

1. FOR PROFESSIONAL, *IN VITRO* DIAGNOSTIC USE ONLY.

2. This method is established using urine only. No other fluid has been evaluated. Urine has the potential to be infectious. Follow Universal Precautions for proper handling and disposal methods.

3. Do not use this kit beyond its expiration date. Do not reuse the Test Device.

## Storage & Handling Requirements

Store at room temperature (15 – 28  C). Do not freeze. Refer to expiration date for stability.

## Sample Collection & Preparation

A fresh urine sample should be collected in the cup device immediately prior to testing. The urine should be collected to the recommended volume indicated by the "FILL TO HERE" mark on the outside of the cup. Examine the temperature strip within 1 minute after collecting the specimen. The temperature should be between 90 and 100  F. Samples outside this range may have been adulterated.

## Assay Procedure

### *Preparation*

1. Confirm that the cup device is at room temperature (15 – 28  C) before testing.

2. Do not break the seal on the on the lid until you are ready to perform the test.

### *Testing*

1. Open the foil pouch, remove the test device, remove the cap from the test device and discard the desiccant packets.

2. Have the donor collect his or her urine specimen in the cup to the recommended volume. Make sure that the urine level is at least at the "FILL TO HERE" mark printed on the front of the cup.

3. Read the test results when indicated (see When to Read Test Results Using the "Timer.")



## When to Read Test Results Using the "Timer"

Phamatech, Inc., 9530 Padgett Street, Suite 101   San Diego, CA 92126 USA
(888) 635-5840 Toll-free   (858) 635-5843 fax    Internet: www.phamatech.com



When the "RESULT READY" window is completely filled with red color, or is almost completely covered with red color that reaches the top of the window, the test results are ready to interpret.



When red color becomes clearly visible at the bottom of the "RESULT EXPIRED" window, test results should no longer be interpreted and should not be considered as conclusive.

## Interpretation of Test Results



**Negative Test Results For All Drugs Tested**

**Negative** – A negative result is indicated when two (2) colored bands appear, one in the Control Region (C) and one in the Test Region (T), *before* any red color appears at the bottom of the "RESULT EXPIRED" window. This result indicates that the target drug is not present or its concentration is below the detection sensitivity of the test panel. Some negative results may appear in as little as 1 minute, and can be safely interpreted as soon as 2 colored bands are visible.



**Positive Test Results For Amphetamine & THC**

**Positive** – A positive result is indicated when only one (1) colored band appears in the Control Region (C) and no band appears in the Test Region (T), *after* a red spot appears in the "RESULT READY" window. This result indicates that the target drug concentration is at or above the detection sensitivity of the panel. More than one panel may be positive. Potentially positive results can only be reported when a red spot appears in the timer's "RESULT READY" window, and *before* any red color appears at the bottom of the timer's "RESULT EXPIRED" window.



**Invalid Test Results For Cocaine & Opiates**

**Invalid** – A test must be considered invalid if, *after* a red spot appears in the "RESULT READY" window, no bands appear or if a band appears in the Test Region without a Control Band. The presence of a Control Band is necessary to confirm assay performance.

4

Phamatech, Inc., 9530 Padgett Street, Suite 101   San Diego, CA 92126 USA
(888) 635-5840 Toll- free   (858) 635-5843 fax    Internet: www.phamatech.com

## Quality Control

An internal procedural control line has been incorporated into the test device to help ensure proper kit performance and reliability. However, the use of external controls is recommended. Positive and negative controls within 25% of the cutoff concentration should produce the expected results. For positive controls, only one (1) colored band will appear in the Control Region (C), and no band will appear in the Test Region (T). For negative controls, two (2) colored bands will appear, one in the Control Region (C) and one in the Test Region (T).

## Limitations of the Procedure

1. It is possible that substances and factors not described in this directional insert may interfere with the test, causing false results (e.g. technical or procedural error).

2. This test has been developed for testing urine samples only. Its performance using other specimens has not been substantiated.

3. Adulterated urine samples may produce erroneous results. Strong oxidizing agents such as bleach (hypochlorite) can oxidize drug analytes. If a sample is suspected of being adulterated, a new sample must be obtained.

4. All preliminary positive results must be confirmed by another method. Gas chromatography/mass spectrometry (GC/MS) is the method of choice to confirm the presence and concentration of a drug in urine.

5. This test is a qualitative screening assay. It is not designed to determine the quantitative concentration of target drugs or the level of intoxication.

6. Because QuickScreen™ is a competitive assay no prozone effect is present.

7. Occasionally, samples containing target drugs below the target drug's cutoff sensitivity for the test may produce a positive result.

## Performance Characteristics

**Sensitivity** – The sensitivity of the QuickScreen™ Pro Multi Drug Screening Test was evaluated on clinical (urine) samples and compared with a commercially available immunoassay at the cutoff concentrations. In addition, the combined studies of two independent clinical laboratories are reported for overall sensitivity, comparing QuickScreen™ to the Emit II instrument-based immunoassay.

**Specificity** – The specificity of the QuickScreen™ Pro Multi Drug Screening Test was evaluated on clinical (urine) samples and compared with a commercially available immunoassay at the cutoff concentrations. In addition, the combined studies of two independent clinical laboratories are reported, comparing QuickScreen to the Emit II assay.

Phamatech, Inc., 9530 Padgett Street, Suite 101   San Diego, CA 92126 USA
(888) 635-5840 Toll- free   (858) 635-5843 fax    Internet: www.phamatech.com

**Accuracy** – The accuracy of the QuickScreen™ Pro Multi Drug Screening Test was evaluated on clinical (urine) samples and compared with a commercially available immunoassay at the cutoff concentrations. In addition, the combined studies of two independent laboratories are reported, comparing QuickScreen to the Emit II assay.

| Analyte | In-House Study, % Agreement | | | | | Clinical Study, % Agreement | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | PCP | AMP | THC | COC | OPI | PCP | AMP | THC | COC | OPI |
| n = | 167 | 189 | 143 | 164 | 176 | 140 | 124 | 102 | 143 | 151 |
| Sensitivity | 99 | 97.6 | 99 | 100 | >99 | 95 | 98.8 | 98 | 100 | >99 |
| Specificity | 99 | 100 | 99 | 95.9 | >99 | 99 | 100 | 99 | 87.5[1] | >99 |
| Accuracy | >99 | 99.4 | 98 | 98.1 | >99 | 97.9 | 99.2 | >98 | 96.5 | >99 |

[1] Five discrepant results were observed in the Cocaine Clinical Study. The samples were from 3 to 10% below the assay cutoff concentration (271 to 293 ng/mL) and subsequently tested positive by GC/MS.

**Precision** – Eight urine pools; ranging in concentration from 0 to 200% of cutoff, were assayed twice a day for 20 days. The results were interpreted individually by two technicians. The inter- and intra-assay coefficients of variation were determined to be less than 2%.

**Cross-Reactivity** – The following structurally related compounds were spiked into normal human urine and found to cross-react in the QuickScreen Pro Multi Drug Screening Test. The results, in g/mL, are expressed as that amount of compound capable of giving a result equivalent to the target drug at its cutoff concentration. Unless otherwise noted, a blank space indicates no interference was observed when the compound was tested to 100 g/mL.

| Compound | PCP | AMP | THC | COC | OPI |
|---|---|---|---|---|---|
| 2-Ethylidene-1,5-Dimethyl-3,3-Diphenylpyrrolidine (EDDP) | 25 | | | | |
| Phencyclidine | 0.025 | | | | |
| d-Amphetamine | | 1 | | | |
| dl-Amphetamine    3-Hydroxytyramine    ( )- -Phenylethylamine | | 10 | | | |
| l-Amphetamine    Mephentermine    (R)-( )- -Phenylethylamine | | 100 | | | |
| ( )-3,4-Methylenedioxyamphetamine | | 4.5 | | | |
|  -Phenylethylamine | | 10 | | | |
| Tyramine | | 12.5 | | | |
| 11-Hydroxy- 9-THC[A] | | | 1 | | |
| 11-Nor- 8-THC-2-Carboxylic Acid[A] | | | 0.1 | | |
| 11-Nor- 9-THC-2-Carboxylic Acid[A]    9-Tetrahydrocannabinol | | | 0.05 | | |
| 8-Tetrahydrocannabinol | | | 100 | | |
| Benzoylecgonine    Cocaine | | | | 0.3 | |
| Metoclopramide | | | | 25 | |
| Procaine    Pyrilamine | | | | 100 | |
| 6-Acetylmorphine    Hydromorphone | | | | | 10 |
| Codeine | | | | | 1 |
| Ethylmorphine[B]    Morphine    Nalorphine | | | | | 2 |
| Heroin[B]    Hydrocodone | | | | | 2.5 |

6

**IN THE**
**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

Alann Vega #R04203,
    Plaintiff

      vs.

Terry McCann,Roger E.Walker Jr.,
Othello L.Hamilton,
Darryl Johnson,Anna Dockery,
Lieutenant Edwards,Ami Workman,
Lieutenant Buzinsci,
Lieutenant Vaughn,
Sherry T Benton,IDOC,
    Defendants

Case No._____

**PROOF/CERTIFICATE OF SERVICE**

      TO:      Office of
     CLERK OF THE U.S DISTRICT COURT
     NORTHERN DISTRICT OF ILLINOIS
       MICHAEL W.DOBBINS
       219 S.DEARBON St.
       Chicago,IL 60604

**PLEASE TAKE NOTICE** that on August 5,2008,I have placed the documents listed below in the institutional mail at Stateville Correctional Center,properly addressed to the paties listed above for mailing through the United States Postal Service:

(1) Original Complàint and (1) Original Motion to procced in Forma pauperis &·for Appointment of Counsel.(11) copies of original - Complaint & (1) copy of Motion to procced in Forma pauperis & for Appointment of Counsel.

Pursuant to 28 USC 1746,18 USC 1621 or 735 ILCS 5/109,I declare, under penalty of perjury,that I am a named party in the above action that I have read the above documents,and that the information contained therein is true and correct to the best of my knowledge.

Date:  __August 5,2008__

/s/ _____
Alann vega
IDOC# R04203
Stateville C.C
PO Box 112
Joliet,IL 60434